In re Donald L. GONZALES, Debtor.

**SPOKANE RAILWAY CREDIT UNION, Appellant,**

v.

**Donald L. GONZALES, Appellee.**

Bankruptcy No. 93–02711–K13.
No. CS–94–166–JLQ.

United States District Court,
E.D. Washington.

Sept. 21, 1994.

Gregory R. Heline, Spokane, WA, for debtor/appellee.

J.T. Janecek, Spokane, WA, for appellant.

MEMORANDUM OPINION AFFIRMING IN PART, REVERSING IN PART, AND REMANDING BANKRUPTCY COURT ORDER

QUACKENBUSH, Chief Judge.

**THIS MATTER** comes before this court on appeal from a decision rendered by the

Bankruptcy Court for the Eastern District of Washington. A hearing on this appeal was heard with oral argument on September 9, 1994. Appellant was represented by J.T. Janecek; Debtor–Appellee was represented by Gregory Heline.

Appellant, Spokane Railway Credit Union (SRCU), objected to the proposed Chapter 13 plan of Debtor Donald Gonzales. Overruling the objection, the Bankruptcy Court confirmed the plan. SRCU appeals the confirmation, raising two general issues on appeal: (1) Whether Debtor acted in good faith in proposing his Chapter 13 plan; and (2) whether the unsecured creditors were "fairly" segregated into two different classes. For the following reasons, this court remands on the first issue, and affirms in part and reverses in part on the second issue. Specifically, this court affirms, *inter alia*, the Bankruptcy Court's decision regarding separate classification of the child support obligation.

## I. BACKGROUND

In October 1993, Debtor, Donald Gonzales, lost his job with H & N Electric. He claims he was terminated because his creditors had been contacting H & N Electric about his past due debts.[1] On October 12, 1993, Debtor filed for bankruptcy under Chapter 13 of the Bankruptcy Code.

The Debtor owed Spokane Railway Credit Union approximately $16,230 on a 1992 Pontiac Firebird. The Chapter 13 plan submitted by Debtor proposed to pay SRCU $9,650, as a secured creditor on the 1992 Pontiac Firebird that SRCU financed for Gonzales in 1992. The remaining portion of the unpaid car loan, approximately $6,500, was to be treated as unsecured debt, and SRCU would receive nothing against the $6,500 under the plan.

The plan also provided that certain favored unsecured creditors would be paid in full, while other unsecured creditors, such as SRCU for the excess part of its car loan, would not be paid at all. For example, child support obligations owing by Debtor since 1980 in the amount of $18,000 would be paid

in full under the plan; a co-signed debt owing to Washington Trust Bank on a credit card would be paid in full; a co-signed debt owing to Washington Trust Bank for a car loan for the benefit of another person would be paid in full; and a co-signed debt owing to Associated Credit for dental work performed on Debtor's ex-wife and live-in girlfriend, "Sam" Wolferman, would be paid in full. Unsecured creditors going unpaid would be U.S. Bank Credit Line, U.S. Bankcard Division, Household Finance for the unsecured portion on a computer loan, and SRCU for its excess unsecured portion on the 1992 Pontiac Firebird loan.

SRCU objected to this plan in the Bankruptcy Court. In addition to objections to the separate classifications for the unsecured debt, SRCU complained that Debtor acted in bad faith by fraudulently transferring $25,000 to $50,000 in business equipment to his ex-wife and live-in girlfriend, "Sam" Wolferman, 6 months before declaring bankruptcy.

Gonzales and Wolferman divorced in 1984. Nonetheless, it appears the two have lived together since the divorce. In 1988 or 1989, Gonzales loaned Wolferman $10,000 toward her part-time advertising business, which she ran out of their home. The Debtor evidently acquired an interest in the business.

According to the affidavit of Wolferman, that business, begun in October 1987, consisted of three desks, a Sharp copier, and a few clients. Wolferman was unable to earn enough money to repay the loan to Gonzales. Therefore, according to Wolferman, she transferred a half-interest in her home to Gonzales. However, Wolferman also states in her affidavit that Gonzales forgave the loan and relinquished any interest he had in the business to Wolferman when her corporation dissolved in September 1993.

These two allegations appear inconsistent. Assuming September 1993 is the date Gonzales forgave the loan, he could not have received a half-interest in Wolferman's home in exchange therefor, since he already had been deeded a half-interest in the home in August 1992, a year prior. It is unclear

---

1. H & N Electric re-hired Gonzales in March 1994, after this bankruptcy was filed.

whether Gonzales received any consideration for relinquishing whatever interest he had in Wolferman's business as a result of the $10,000 loan.

At the meeting of creditors on November 18, 1993, Gonzales testified that the value of the interest in the advertising business he transferred back to Wolferman was approximately $50,000. Wolferman maintained in her affidavit that Gonzales must have been mistaken as to this value because her business was not worth $50,000. She claims the equipment was worth no more than $2,000 and her client base was essentially valueless because her clients were not bound to her contractually.

SRCU contends that Gonzales failed to propose his plan in good faith in as much as he neglected to list the transfer of his property interest in the advertising business back to Wolferman; he allegedly mischaracterized several debts as co-debts, including debts of Sam Wolferman on which Debtor was merely the accommodation maker; his future income will rise since he was re-hired by his former employer, H & N Electric, after the bankruptcy petition was filed; unsecured creditors have been unfairly divided into two classes, with the preferred class receiving 100% repayment, while the unpreferred class will receive 0% repayment; the car loan from SRCU has been modified downward from about $16,000 to a secured value of only $9,650; and Debtor is $18,000 in arrears on child support since 1980, even though his 1992 earnings totalled $40,000, and he purchased a $70,000 motor home in 1991.

Debtor counters that he exaggerated the amount transferred to Wolferman since, according to her affidavit, the value of the business consisted of only $2,000 in equipment; he had no interest in the advertising business to transfer anyway; debts listed as co-debts are truly co-debts; and child support is non-dischargeable. Debtor maintains that under the totality of the circumstances, he acted in good faith.

The Bankruptcy Court overruled the objections of SRCU to the Chapter 13 plan. The plan to repay creditors was orally confirmed by the Bankruptcy Court on March 31, 1994. On April 1, 1994, a written Order confirming the plan was filed. No findings of fact or conclusions of law were entered.

SRCU appeals the Order confirming the Chapter 13 plan. SRCU contends that the Bankruptcy Court erred in failing to find that, because Debtor transferred his interest in Wolferman's advertising business back to Wolferman 6 months before filing for bankruptcy, the Debtor lacked "good faith" in proposing his plan, and the assets should be recovered under Chapter 7 as a "preference." SRCU also contends that the Bankruptcy Court erred by allowing favored status for certain unsecured creditors. SRCU maintains that the "best interests" of the creditors would be better served if this case was converted to a Chapter 7 bankruptcy.

## II. DISCUSSION

This court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a) (district courts shall have jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges).

Findings of fact by the Bankruptcy Court are reviewed for clear error; conclusions of law are reviewed de novo. *Wien Air Alaska, Inc. v. Bachner*, 865 F.2d 1106, 1108 (9th Cir.1989); *In re Deer Park*, 136 B.R. 815, 817 (9th Cir. BAP 1992); Fed.R.Civ.P. 52; B.R. 8013. Mixed questions of law and fact are reviewed de novo. *In re Safeguard Self–Storage Trust*, 2 F.3d 967, 970 (9th Cir. 1993); *In re Woodson Co.*, 813 F.2d 266, 270 (9th Cir.1987); *Multnomah County v. Rudolph (In re Rudolph)*, 166 B.R. 440, 441 (D.Or.1994).

"A bankruptcy judge's finding that a debtor's plan is proposed in good faith is a finding of fact reviewed under the clearly erroneous standard." *In re Metz*, 820 F.2d 1495, 1497 (9th Cir.1987); *accord In re Slade*, 15 B.R. 910, 911 (9th Cir. BAP 1981). Whether a plan unfairly discriminates between classes of unsecured creditors is a question of law reviewed de novo. *Groves v. LaBarge*, 160 B.R. 121, 122 (E.D.Mo.1993).

## A. "Good Faith" of Debtor

A Chapter 13 plan shall be confirmed if, among other factors, the plan has been proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1325(a)(3). Good faith is mandatory for confirmation of a Chapter 13 plan. *In re Chinichian,* 784 F.2d 1440, 1442–44 (9th Cir. 1986); *see also In re Barnes,* 32 F.3d 405, 407 (9th Cir.1994) (making 11 U.S.C. § 1325(a)(5)(B)(ii) mandatory as well). However, under 11 U.S.C. § 1325(a)(3), good faith "is neither defined by statute, nor explained in legislative history." *In re Warren,* 89 B.R. 87, 90 (9th Cir. BAP 1988). In ascertaining good faith, a court must look at the totality of the circumstances to determine whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13. *In re Huerta,* 137 B.R. 356, 366 (Bankr. C.D.Cal.1992). "In the foregoing context, the debtor has the burden to establish good faith...." *In re Warren,* 89 B.R. at 93.

Several factors may be considered under the totality of the circumstances, including: (1) The amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought relief under the Bankruptcy Code; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden that the plan's administration would place upon the trustee. *In re Huerta,* 137 B.R. at 366–67; *See also In re Warren,* 89 B.R. at 93 (listing the same 11 factors).

By pre-printed order filed April 1, 1994, the Bankruptcy Court confirmed Debtor's Chapter 13 plan. In so doing, the court implicitly overruled SRCU's objection to the plan, and found good faith on the part of Debtor in proposing the plan. However, the Bankruptcy Court provided no findings of fact, conclusions of law, or analysis in reaching its decision. This court does not know whether the Bankruptcy Court applied the 11 factors mentioned above in finding good faith.

In his response brief, Debtor admits no findings of fact were made. (*See* Ct. Rec. 6, p. 13.) Nonetheless, Debtor suggests this court may infer the Bankruptcy Court's findings. Debtor argues strenuously that the Bankruptcy Court's implied findings support Debtor's good faith. However, it is difficult for this court to see how it can review *implied* findings for clear error.

In *In re Tucker,* 989 F.2d 328 (9th Cir. 1993), the Ninth Circuit Court of Appeals faced the exact problem before this court. A creditor objected to debtors' good faith because the debtors allegedly concealed funds and prevented a deputy sheriff from seizing those funds shortly before the bankruptcy was filed. *Id.* at 329–30. Despite the objection, "[t]he bankruptcy court confirmed the plan using a pre-printed form." *Id.* at 330.

No findings of fact were given supporting the bankruptcy court's confirmation of the plan. "Nothing said, written or signed by the bankruptcy court provide[d] any basis for overruling the [creditor's] good faith objection." *Id.* The bankruptcy court failed to make findings addressing the bad-faith objection by the creditor, and, therefore, the Ninth Circuit remanded for sufficient findings on whether the debtors acted in good faith. *Id.; accord Connecticut Gen. Life Ins. Co. v. Hotel Assocs. (In re Hotel Assocs.),* 165 B.R. 470, 475 (9th Cir. BAP 1994) (remanding to bankruptcy court for findings on whether plan proposed in good faith).

Here, no written or oral findings exist for this court to review. The Bankruptcy Court provided no specific reasons for overruling the objections of SRCU. This court has no basis upon which to review for clear error

the Bankruptcy Court's presumed finding of good-faith. Accordingly, this court must remand this issue to the Bankruptcy Court for further factual findings as to the basis for overruling the objection of SRCU concerning Debtor's alleged good faith.[2]

### B. Classes of Unsecured Creditors

SRCU also contends that the Bankruptcy Court erred in confirming the plan because the plan discriminates between classes of unsecured creditors. SRCU will receive nothing on its unsecured portion of the 1992 Pontiac Firebird car loan, while other unsecured creditors, such as the Washington Department of Social and Health Services (DSHS), Washington Trust Bank, and Associated Credit, will receive 100% payment on their unsecured debts. SRCU claims that such discrimination is "unfair" and, therefore, violative of 11 U.S.C. § 1322(b).

#### 1. Child Support

■ A plan may designate different classes of unsecured claims, but it may not discriminate unfairly against any class so designated. 11 U.S.C. § 1322(b)(1). The debtor bears the burden of proof that a plan does not unfairly discriminate. *In re Warner*, 115 B.R. 233, 236–37 (Bankr.C.D.Cal. 1989). Unfortunately, the Code provides no definition of "unfair." *Id.* at 237. Moreover, "[t]he legislative history to § 1322(b) does not specify the grounds upon which a court should determine whether a proposed classification is unfair." *In re Smalberger*, 157 B.R. 472, 475 (Bankr.D.Or.1993). As a result, courts have developed a generally applicable test to determine whether a classification is "fair."

■ A court should determine: (1) Whether the discrimination has a reasonable basis; (2) whether the debtor can carry out a plan without the discrimination; (3) whether the discrimination is proposed in good faith; and (4) whether the degree of discrimination is directly related to the basis or rationale for the discrimination. *In re Wolff*, 22 B.R. 510,

512 (9th Cir. BAP 1982). In other words, a court should determine whether the discriminatory treatment rationally furthers an articulated, legitimate interest of a debtor. *In re Lawson*, 93 B.R. 979, 984 (Bankr.N.D.Ill. 1988). SRCU contends that the plan fails this test because it proposes to repay unsecured child support arrearage in full, while SRCU is to be paid nothing on its unsecured claim.

■ In deciding whether a separate classification for child support is fair, courts are divided. Some courts prohibit the inclusion of past-due child support obligations in a Chapter 13 plan. *See Caswell v. Lang*, 757 F.2d 608, 610 (4th Cir.1985) ("Past due child support obligations may not be included in a Chapter 13 plan under the bankruptcy code"); *In re Pacana*, 125 B.R. 19, 25 (9th Cir. BAP 1991) (support obligations insulated from mandatory inclusion in Chapter 13 plan by virtue of express provisions of bankruptcy code); *In re Warner*, 115 B.R. at 241 (child support should generally not be included in Chapter 13 plan); *In re McCray*, 62 B.R. 11, 12 (Bankr.D.Colo.1986) (debt for past-due child support may not be included in Chapter 13 plan). These courts reason that federal bankruptcy courts should not interfere with matters of such particular state concern, and that child support issues are best handled by state courts. Plans that include repayment of child support divest state courts of their ability to enforce payment of arrearage. Furthermore, payment of support might be delayed pending confirmation of the plan. Therefore, according to the above federal courts, Chapter 13 plans should not include child support.

Other courts adopt a different approach. These courts have upheld as fair a distinction in a Chapter 13 plan between unsecured child support and other unsecured debts. *See In re Leser*, 939 F.2d 669, 672 (8th Cir.1991) (no unfair discrimination where counties' claims for child support arrearage

---

**2.** The Bankruptcy Court also is requested to make express findings as to whether the value of property to be distributed under the Chapter 13 plan is not less than the amount that would be paid if the estate of the debtor were liquidated under Chapter 7. *See* 11 U.S.C. § 1325(a)(4). In addition, the Bankruptcy Court should make findings as to SRCU's claim of fraudulent transfer under 11 U.S.C. § 548.

placed in separate class from other unsecured creditors); *In re Benner*, 146 B.R. 265 (Bankr.D.Mont.1992) (upholding plan that provided for 100% repayment of nondischargeable maintenance obligation, while paying nothing to other unsecured claims); *In re Whittaker*, 113 B.R. 531 (Bankr. D.Minn.1990) (no unfair discrimination where child support arrearage paid in full, while general unsecured creditors paid minimal amount); *In re Storberg*, 94 B.R. 144 (Bankr. D.Minn.1988) (upholding plan providing for 100% payment for past due child support and 18% payment to a fifth class of unsecured creditors); *In re Davidson*, 72 B.R. 384, 387 (Bankr.D.Colo.1987) (permitting inclusion of past-due child support in plan upon express consent of child support creditor);[3] *In re Haag*, 3 B.R. 649 (Bankr.D.Or.1980) (plan providing for 100% payment for past-due child support and 25% payment to other unsecured creditors did not unfairly discriminate); *In re Curtis*, 2 B.R. 43 (Bankr. W.D.Mo.1979) (plan providing for 100% payment of past-due child support and 10% payment to other unsecured creditors did not unfairly discriminate). In upholding the plans, these courts required 100% repayment of any child support arrearage, particularly since child support is nondischargeable. *See* 11 U.S.C. § 523(a)(5).

Courts that authorize discrimination in favor of child support claims and against general unsecured creditors have offered two reasons to justify the discrimination. First, they assert that allowing such chapter 13 plans helps assure payment of the child support claims. Strong public policy favors the repayment of child support obligations. Second, these courts recognize that unsecured creditors, generally, receive nothing in a Chapter 7 liquidation anyway. Because child support is non-dischargeable, it must be paid regardless of which bankruptcy chapter is used. In addition, failure to pay child support may result in contempt proceedings, or criminal penalties. Therefore, because the

debtor must repay the arrearage, it is better to get something under Chapter 13 than potentially nothing under Chapter 7.[4]

No previously-mentioned case discussing the inclusion of child support in a Chapter 13 plan directly binds this court. Under the facts of this case, this court finds the position and reasoning of those courts that permit the inclusion and separate classification of child support arrearage in a Chapter 13 plan to be more persuasive. Separate classification for child support is not unfair in light of the nondischargeability of child support, society's strong interest in having child support paid in full, and a debtor's need to start fresh upon completion of the plan. *See In re Bugna*, 33 F.3d 1054, 1059 (9th Cir.1994) ("The Code is designed to afford debtors a fresh start, and we interpret liberally its provisions favoring debtors.")

"While bankruptcy courts must be very sensitive to the needs of this vulnerable class of creditors, payment of prepetition support of alimony [or child support] arrearage through a chapter 13 plan may be completely appropriate in some cases where the debtor is not using the bankruptcy case as a device for evading familial responsibilities." 5 *Collier on Bankruptcy* ¶ 1322.14[1] (15th ed. 1994). Given that Debtor is in arrears some $18,000 since 1980, this court does not believe that Debtor is now using bankruptcy as a means to evade his familial responsibilities, although he may previously have ignored those responsibilities. Besides, Debtor proposes to repay all of the arrearage.

If one is truly concerned about the welfare of a debtor's children, one should foster the ability of a debtor to repay his or her child support arrearage. The end result is what counts. Evidently, outside the strictures of a Chapter 13 plan, Debtor does not have the ability and/or willingness to repay his child support debt. Including 100% repayment of outstanding child support in the Chapter 13

---

**3.** SRCU focuses on this case as requiring express consent by a child support creditor before child support arrearage can be included within a plan. No other case imposes this requirement. Even so, DSHS filed a claim in this case and chose not to object to the plan. Presumably, the child support creditor in this case agreed with repayment through the plan.

**4.** Since SRCU will receive nothing on the unsecured portion of its loan, this second rationale is inapplicable to the case at hand.

plan will help assure that Debtor finally meets this obligation.

Although child support is typically a matter of state concern, this court sees no harm in facilitating payment of the arrearage at this late date. It would seem that any attempt by the state to require repayment has failed in light of Debtor's $18,000 arrearage dating back to 1980. Also, given the length of Debtor's default, there is little to fear from a temporary delay pending the confirmation of Debtor's plan. The facts of this particular case warrant intervention to compel repayment through the Chapter 13 plan. Accordingly, the Bankruptcy Court did not err by confirming a plan which placed child support arrearage into a separate class of unsecured debt within the Chapter 13 plan.

### 2. Co–Signed Debt

SRCU also complains that certain allegedly co-signed debt has been classified differently from the general unsecured debt. In addition to DSHS, Washington Trust Bank will be paid in full on a car loan that benefitted Wolferman, and a credit card that benefitted Debtor, and Associated Credit will be paid in full for a debt incurred by Wolferman.[5] Meanwhile, SRCU will be paid nothing on its unsecured debt incurred by Gonzales.

■ A Chapter 13 plan "may treat claims for a consumer debt of the debtor if an individual is liable on such consumer debt with the debtor differently than other unsecured claims...." 11 U.S.C. § 1322(b)(1). While awkwardly worded, this provision has been interpreted as sanctioning preferential treatment for claims on which a co-signer is liable with the debtor. *See In re Dornon*, 103 B.R. 61, 64 (Bankr.N.D.N.Y.1989). Typically, co-debt is with family or friends. "Without such classification the desire to satisfy, outside the plan, co-signed obligations

held by relatives and friends would hamper a debtor's chances of successfully completing his or her plan." *In re Davis*, 101 B.R. 505, 507 (Bankr.S.D.Ohio 1989); *see also In re Cheak*, 171 B.R. 55, 58 (Bankr.S.D.Ill.1994) ("A debtor's desire to protect a co-signer with whom he has close personal ties might normally justify discriminatory treatment to prevent the debtor from jeopardizing his successful reorganization by attempting repayment outside the plan"). Therefore, debts that are both co-signed and incurred for consumer needs may be classified separately from other unsecured debt. *See In re Riggel*, 142 B.R. 199, 204 (Bankr.S.D.Ohio 1992).

Relying on the special treatment accorded co-debtor claims in § 1322(b)(1), courts have approved plans paying 100% of unsecured, co-signed claims, while paying only 10% to other unsecured claims. *See In re Dornon*, 103 B.R. at 65; *In re Chapman*, 146 B.R. 411, 416 (Bankr.N.D.Ill.1992). Some courts except co-signed claims from the "unfair discrimination" test altogether, *see In re Riggel*, 142 B.R. at 204, while other courts apply the four-factor test of *In re Wolff* to determine whether the discrimination is fair. *See generally In re Easley*, 72 B.R. 948, 955 (Bankr. M.D.Tenn.1987).

Here, the Chapter 13 plan confirmed by the Bankruptcy Court classified co-debt between Debtor and his ex-wife and live-in girlfriend, Wolferman, and co-debt between Debtor and his employer, H & N Electric, separately from other unsecured debt. Because the debt is apparently co-signed, separate classification seems proper. However, "the debtor who seeks to discriminate in favor of a co-signed claim has the burden of showing that such discrimination is fair, and this determination must be made on a case by case basis." *In re Cheak*, 171 B.R. at 58.

■ SRCU argues that the debt is not actually "co-debt" and, therefore, should not

---

5. SRCU also has concern with repayment to Household Finance for a computer loan made to Debtor. That computer was subsequently gifted to Wolferman. In Schedule D, the computer loan is listed as a debt secured by the value of the computer—$365. On the remaining portion of the $1,250 loan, Household Finance apparently will receive nothing. *See* Debtor's Chapter 13

Plan (indicating that only DSHS, Washington Trust Bank, and Associated Credit will be repaid at 100%; remaining unsecured creditors will be paid at 0%). Therefore, the court need not address the propriety of the alleged 100% repayment to Household Finance since it appears that Household Finance will not be paid 100%.

receive preferential treatment.[6] The court finds that the debt is co-debt, but, nonetheless, concludes that separate classification for some of the debt is unfair and in violation of § 1322(b)(1).

First, SRCU contends that the car loan from Washington Trust Bank is not co-debt because the car loan benefitted Wolferman, not Debtor. By analogy to stay protection under Chapter 13, SRCU maintains that co-debt only exists when another extends his or her credit to help the debtor receive the benefit of the extension of credit. Because Wolferman drives the car that was the subject of the Washington Trust Bank car loan, and, therefore, receives the benefit, SRCU charges that the loan is not "co-debt."

The loan was co-signed by Wolferman and H & N Electric, and Debtor used the funds from Washington Trust Bank primarily for personal, family, or household purposes, namely the purchase of an automobile. That makes the debt "co-debt" for purposes of § 1322(b)(1). *See In re Dornon,* 103 B.R. at 65. However, the debt benefitted Wolferman, not Gonzales. In his response brief, Gonzales admits H & N Electric, the other co-signer, co-signed the car loan to help Gonzales "provide Ms. Wolferman with a car." (*See* Ct. Rec. 6, p. 18.) Should Gonzales be permitted to treat this co-debt separately from other unsecured debt where the co-debt benefitted the co-signer, not the debtor?

The legislative history to § 1322(b)(1) notes:

> Although there may be no theoretical differences between codebtor claims and others, there are important practical differences that must be recognized. Because codebtors are often relatives or friends, the debtor may feel a great need to pay the debt in full, even if that is not permitted within the chapter 13 plan. If the debtor can be required to devote all disposable income to the plan, the conflicting desire to voluntarily make payments outside the plan on a cosigned debt may spell failure for the plan by leaving insufficient income to keep up plan payments. If as a practical matter, the debtor is going to pay the codebtor claim, he should be permitted to separately classify it in chapter 13.

5 *Collier on Bankruptcy* ¶ 1322.05[1] (15th ed. 1994) (citing to S.Rep. No. 65, 98th Cong. 1st Sess. 17–18 (1983)) (internal quotations and footnotes omitted). Underlying the assumption that a debtor will feel a great need to pay in full a co-signed debt between the debtor and a friend or relative is the additional assumption that the co-debt benefitted the debtor, not the friend or relative. The obligation to repay arises because the friend or relative extended his or her credit to help the debtor acquire credit. In return for the help, a debtor will feel a moral obligation to repay the loan in full to protect the co-signer.

However, the same is not true where the debtor extends his or her credit to help the co-signer. No moral obligation exists to repay the loan since no help was given to the debtor. On the contrary, it was the debtor that helped the co-signer. Without the moral obligation to repay the loan in full, irrespective of the plan, there is little chance this type of co-debt will impede completion of the plan. Therefore, no reason justifies the classification of unsecured co-signed debt, acquired for the benefit of the co-signer, separately from other general unsecured debt. To do so would be unfair to the general unsecured creditors. Accordingly, this court

---

**6.** SRCU argues throughout that the claimed co-debt should not be classified separately because Debtor has failed to show a business purpose for the classification. (Citing *In re Wolff,* 22 B.R. at 511–12). *In re Wolff* does not require a "business purpose" for separate classification. Business purpose just happened to be the reason put forth by the debtor in that case to justify the discrimination. Moreover, *In re Wolff* did not discuss co-debt as a basis for separate classifications of unsecured debt, especially since the case was decided 2 years before the amendment allowing separate treatment for co-debt. *See In re*

*Cheak,* 171 B.R. 55, 57 (Bankr.S.D.Ill.1994) ("Section 1322(b)(1) was amended in 1984 to add the provision regarding codebtor claims").

Cases discussing co-debt do not require a business purpose for a separate classification. *See In re Dornon,* 103 B.R. at 61. Case law is replete with instances where a court classified co-signed debt separately from general unsecured debt regardless of a business reason for doing so. *See In re Todd,* 65 B.R. 249 (Bankr.N.D.Ill.1986) (need to maintain confidence and harmony with police partner justified discrimination favoring co-debt with that partner).

finds that § 1322(b)(1) is limited to co-signed debt acquired for the benefit of the debtor, not the co-signer. *See generally In re Dornon*, 103 B.R. at 65 (permitting separate classification of bank loan co-signed by mother, but belonging to debtor); *In re Perkins*, 55 B.R. 422, 426 (Bankr.N.D.Okla.1985) (upholding plan that discriminated in favor of loan benefitting debtors, but secured by household goods of son).

■ If only Wolferman had co-signed the Washington Trust Bank car loan, it would have been unfair to the general unsecured creditors to classify this debt separately in Debtor's Chapter 13 plan. The loan was acquired for the benefit of Wolferman; she drove the car. No moral obligation would exist for Gonzales to repay the loan.

However, H & N Electric, Debtor's employer, also co-signed the loan. Debtor has strong reason to repay the loan in full, regardless of the provisions of the Chapter 13 plan. Debtor may be fired, again, if H & N Electric has to repay the loan on behalf of Debtor. As a practical matter, Debtor is going to repay the loan to keep his job. Therefore, separate classification of this debt is justified. The Bankruptcy Court did not err by permitting separate classification of the Washington Trust Bank car loan co-debt.

■ Second, SRCU argues that the Washington Trust Bank credit card cannot be co-debt because Wolferman's limited income of $400 per month could not have played a part in receipt of the credit card. Again, since Wolferman, H & N Electric, and Gonzales co-signed for the credit extension, and since the credit card was primarily used for personal, family or household purposes, the Washington Trust Bank credit card is "co-debt" for purposes of § 1322(b)(1).

■ Additionally, separate classification of the credit card debt fairly discriminates against other unsecured creditors. *See In re Cheak*, 171 B.R. at 57–58. SRCU admits in its opening brief that "only the debtor used the credit card." (*See* Ct. Rec. 4, p. 6.) By co-signing the credit card application, Wolferman accommodated Gonzales. She helped Gonzales. In addition, H & N Electric helped Gonzales by co-signing for the credit extension. Therefore, the rationale for permitting separate classification of co-signed unsecured debt under § 1322(b)(1) applies. The fact that Wolferman may have earned only $400 per month at the time the credit card was granted is of limited import. Her credit and income played some part in the issuance of the credit card, which ultimately benefitted Gonzales. The Bankruptcy Court properly permitted separate classification of this debt as well.

■ Third, SRCU contends that the co-debt owing Associated Credit for dental work performed on Wolferman is the debt of Wolferman.[7] Because Wolferman received the benefit of the extension of credit, SRCU maintains that Gonzales cannot be a co-debtor with Wolferman. Although, technically, the debt was not "co-signed," because Gonzales orally guaranteed the debt, for all intents and purposes the debt was "co-signed" since both Wolferman and Gonzales were liable on it. The credit extended for the dental services was primarily used for personal, family or household purposes. Therefore, the debt owing to Associated Credit is "co-debt" for purposes of § 1322(b)(1).

■ Nonetheless, separate classification of this unsecured debt would be unfair to the other unsecured creditors. Clearly, Wolferman alone benefitted from this debt. No

---

7. Interestingly, SRCU failed to raise a Statute of Frauds argument in the Bankruptcy Court regarding this debt. Apparently, at the time of the dental work, Gonzales personally told the dentist that Gonzales would be responsible for the bill. In other words, Gonzales *orally* guaranteed payment of the dental bill. Usually, a guarantee must be in writing. *See Kirkland v. Dressel*, 104 Wash. 668, 177 P. 643 (1919) (oral contract assuming and agreeing to pay debt of another is unenforceable by statute of frauds). Nevertheless, even if SRCU now wished to raise a Statute of Frauds argument to exclude the co-debt dental bill from the Chapter 13 plan, SRCU could not. A Statute of Frauds argument must be raised in the bankruptcy court to preserve such an argument for appeal. *See In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1128 (5th Cir.1993) (affirming waiver of argument under Statute of Frauds for failure to raise in bankruptcy court); *See also In re Gilchrist*, 891 F.2d 559, 561 (5th Cir.1990) (noting well-established doctrine that reviewing courts do not consider arguments or claims not presented to the bankruptcy court).

moral obligation exists for Gonzales to repay the debt since he was not the primary recipient of the credit. He only extended his credit to accommodate Wolferman. Therefore, no reason exists to treat this debt separately. The Bankruptcy Court erred by permitting separate classification of the debt owing to Associated Credit.

In sum, the Bankruptcy Court acted properly in overruling any objection to the Chapter 13 plan because the plan classified the car loan debt owing to Washington Trust Bank and the credit card debt owing to Washington Trust Bank separately from other unsecured debt. However, the Bankruptcy Court erred by failing to sustain the objections to the preferential classification accorded the Associated Credit dental-work debt. Accordingly,

**IT IS HEREBY ORDERED:**

1. The Order Confirming Chapter 13 Plan and Attorney's Fees to be Paid Through Plan, filed April 1, 1994 by the Bankruptcy Court is **AFFIRMED IN PART, REVERSED IN PART,** and **REMANDED.**

The issue of whether Debtor acted in good faith in proposing his Chapter 13 plan is **REMANDED** to the Bankruptcy Court for further factual findings as to the basis for overruling the objection of SRCU to Debtor's alleged good faith.

As to the issue of whether the unsecured creditors were "fairly" segregated into two different classes, the Bankruptcy Court is **AFFIRMED** in its decision regarding the child support obligation, the Washington Trust Bank car loan debt and the Washington Trust Bank credit card debt, and is **REVERSED** in its decision regarding the Associated Credit dental work debt.

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order; furnish copies to counsel; remand to the Bankruptcy Court; and close the file.